Deborah Lou HOWARD

v.

Attorney General ASHCROFT, the Federal Bureau of Prisons, Kathleen Hawk Sawyer, Ray E. Holt, and Callie P. Farr

and

United States of America

v.

Deborah Lou Howard

No. CIV. 03–123–D–M3, CRIM. 00–106–D–M3.

United States District Court, M.D. Louisiana.

Feb. 27, 2003.

### RULING & ORDER

BRADY, District Judge.

Pending before the court are two actions brought by petitioner Deborah Lou Howard against the United States and various of its agents in their official capacities (collectively referred to as the "Government"). The core of her complaint is that the Department of Justice and the Bureau of Prisons ("Bureau") have violated her federal constitutional and statutory rights by changing their interpretation of the Bureau's discretion to place certain classes of convicts directly into community corrections centers. The Bureau has regarded itself as having that discretion for decades and, in fact, exercised it in Ms. Howard's favor in October of 2002. The Department of Justice has since reconsidered the Bureau's interpretation of the relevant statutory language. It now thinks the Bureau's earlier acts of discretion were "unlawful." Based on this opinion, the Bureau has informed the federal courts that it will no longer exercise its former discretion. More importantly, for Ms. Howard, the Bureau has informed her that she will be transferred to a federal corrections facility in Marianna, Florida. It is this transfer that Ms. Howard seeks, in one way or another, to stop.

In her first action, Ms. Howard requests that this court issue a preliminary injunction against the Bureau, and its leadership in the persons of United States Attorney General John Ashcroft, Bureau Director Kathleen Hawk Sawyer,[1] the Bureau's Regional Director for the South East Region, Ray E. Holt, and Callie P. Farr, who is the Community Corrections Manager for the same region of the Bureau. The injunction Ms. Howard seeks would order that she remain at her current place of confinement rather than be transferred to a federal corrections facility in Marianna, Florida. In the alternative, Ms. Howard asks this court for a preliminary injunction so

---

1. The court notes that Ms. Sawyer has announced her retirement since this case was instituted. When her retirement becomes effective, she will be replaced by Harley Lappin. See Press Release, Department of Justice, Kathleen Hawk Sawyer to Retire; Harley Lappin to be Appointed as New Director (Feb. 11, 2003) *available at* <http://www.bop.gov> via "Public Info" and "Press Releases" links (visited Feb. 19, 2003). The court has no doubt that it can accommodate this change in direction by substituting parties where appropriate.

that she may petition the court to hold a later hearing to vacate her prior sentence and resentence her in a manner that allows her to remain at the Bannum Place of Orlando Community Corrections Center ("Bannum Place") until her release.

Formally, this matter comes to the court on two motions. First, Ms. Howard brought a motion for an emergency stay which, pursuant to Federal Rule of Civil Procedure 8(f),[2] this Court treated as two motions, one for a temporary restraining order and another to vacate her sentence under 28 U.S.C. § 2255.[3] Second, she has filed a complaint seeking declaratory and injunctive relief under the Administrative Procedures Act (the "APA"), 5 U.S.C. §§ 553, 702, and 706 with jurisdiction predicated on 28 U.S.C. § 1331.[4]

The court issued a temporary restraining order ("TRO") on January 28, 2003.[5] By consent of the parties, the court extended the temporary restraining order until February 21, 2003.[6] Additionally, by consent of the parties and representations made to the court by counsel for the Government, any issues regarding procedural defects or service were waived for the purposes of the preliminary injunction hearing so that all parties can get to the next step.[7]

The court took evidence and heard oral argument on February 21, 2003. Having determined that Ms. Howard has met her burden on at least one of her claims, the court granted her motion for a preliminary injunction and enjoined the Government from transferring Ms. Howard from Bannum Place pending a final determination on the merits.

## I. FACTUAL BACKGROUND AND SUMMARY OF ARGUMENTS

In August 2000, the United States Attorney's Office confronted Deborah Howard with a charge of conspiracy to possess with the intent to distribute five or more kilograms of cocaine, a violation of 21 U.S.C. § 846(a)(1).[8] Ms. Howard cooperated with authorities and pled guilty to the charge on November 8, 2001.[9] Ms. Howard was a low level participant in the conspiracy. Her role was that of a courier, or a "mule."

The original pre-sentence investigation report, prepared on March 14, 2002, indicated that Ms. Howard had a criminal history category of I (the lowest level) and that her offense level was 25 because she met all of the criteria for the statutory "safety valve" and received a two level reduction for her "first offender" status under the Sentencing Guidelines. In between indictment and sentencing, Ms. Howard provided invaluable assistance to the Government with regard to informa-

---

**2.** Petitions filed under 28 U.S.C. § 2255 are subject to the Federal Rules of Civil Procedure where no procedure is specifically designated by the Section 2255 Rules. *See* Section 2255 Rule 12 (2003)("If no procedure is specifically prescribed by these rules, the district court may proceed in any lawful manner not inconsistent with these rules . . . and may apply the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure, whichever it deems most appropriate to motions filed under these rules."). Thus, finding no applicable procedure under the Section 2255 Rules, the Court rules that the very unusual circumstances that this case arises under warrant an application of Federal Rule of Civil Procedure 8(f).

**3.** Docket No. 1.

**4.** Docket No. 1 (civil).

**5.** Docket No. 16.

**6.** Docket No. 18.

**7.** Docket No. 10 (civil).

**8.** Docket No. 1.

**9.** Docket No. 61.

tion about her co-conspirators. In fact, Ms. Howard continued to provide assistance to federal and state investigators even though some of her co-conspirators were still at large and had significant criminal histories for violence. So valuable was the information she gave and so dangerous were some of the people her cooperation helped to convict, the court and counsel even considered placing her into the witness protection program. In the words of one of the prosecutors from the Middle District of Florida her cooperation was "crucial to the development of the case."

Ultimately, based on the assistance provided by Ms. Howard and her acceptance of responsibility for her actions, the Government filed a § 5K1.1 motion requesting this court to depart downward from the applicable offense level found in the Sentencing Guidelines by 11 levels. This court decided to depart an additional level, and reduced Ms. Howard's offense level to a 13. This categorization placed her at the lowest level of Zone D of the Sentencing Guidelines Sentencing Table, subject to a term of imprisonment between twelve and eighteen months.

On August 16, 2002, the court imposed a sentence of twelve months imprisonment, three years of supervised release immediately following said term of imprisonment, a $ 2,000 fine payable in monthly installments, and a mandatory $100 assessment.[10] The court recommended that "the defendant serve her sentence at Bannum Place in Orlando, Florida"[11] and ordered that she surrender herself "for service of sentence at the institution designated by the Bureau of Prisons" at a time "designated by the Probation or Pre–Trial Services Officer."[12]

The Bureau, acting pursuant to a statutory grant of authority, decided that it should follow this court's recommendation and ordered that Ms. Howard serve her term of imprisonment at Bannum Place, a community corrections center, beginning on October 14, 2002. This designation allowed Ms. Howard to continue working as a paralegal and provide financial support for her daughter and her infant grandchild during the daytime, but requires that she otherwise be confined to that community corrections center ("CCC").[13] In fact, this

---

10. Docket No. 94.

11. *Id.*

12. *Id.*

13. Community corrections centers are popularly known as "halfway houses." The popular name is not perfectly accurate, however, because it elides a distinction between the programs offered there. CCCs offer two programs, a "Community Corrections Component" and a "Prerelease Component."

(1) The Community Corrections Component is designed as the most restrictive option. Except for employment and other structured program activities, an inmate in this component is restricted to the CCC. An inmate shall ordinarily be placed in the Community Corrections Component upon arrival at the CCC.

This Orientation period normally lasts for two weeks or until the inmate has demonstrated to CCC staff the responsibility necessary to function in the community. Based on their professional judgment, CCC staff shall determine when an inmate is prepared to advance to the Prerelease Component.

(2) The Prerelease Component is designed to assist inmates making the transition from an institution setting to the community. These inmates have more access to the community and family members through weekend and evening passes.

Federal Bureau of Prisons, Policy Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure,* ¶ 7a. Thus, not everyone who is in a halfway house is halfway between jail and home. These facilities are used for different purposes. Some CCC inmates enter these facilities after long terms in prison. For them, the facility is intended literally as a halfway house. "CCCs provide an excellent transitional environment

designation was frequently the topic of conversation between the Government, Ms. Howard's counsel, and this court. All parties agreed that Ms. Howard deserved a lesser punishment due to the circumstances particular to her case. Moreover, all parties worked together to ensure that she would have the opportunity for this designation.

Ms. Howard surrendered herself at the appointed place and time on October 14, 2002, and began serving her sentence. By all accounts, Ms. Howard is a model prisoner. In addition, her ability to work generates sufficient income to pay for the cost of her incarceration at Bannum Place.

Meanwhile, the Department of Justice decided to reevaluate the very statutory grant of authority that the Bureau exercised in assigning Ms. Howard to Bannum Place. According to the Bureau at the time of Ms. Howard's sentencing, 18 U.S.C. § 3621(b) gave it the discretion to commit people convicted of Zone C and D felonies directly to CCCs even though the federal district courts do not have such discretion in imposing their sentences.[14] The crucial passage appears in 18 U.S.C. § 3621(b), which is entitled "Place of imprisonment." That section provides:

> The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional facility that meets minimum standards of health and habit-

ability established by the Bureau, whether maintained by the Federal Government or otherwise and whether within or without the judicial district in which the person was convicted, that the Bureau determines to be appropriate and suitable, considering—

> (1) the resources of the facility contemplated;
>
> (2) the nature and circumstances of the offense;
>
> (3) the history and characteristics of the prisoner;
>
> (4) any statement by the court that imposed the sentence—
>
> (A) concerning the purposes for which the sentence to imprisonment was determined to be warranted; or
>
> (B) recommending a type of penal or correctional facility as appropriate; and
>
> (5) any pertinent policy statement issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28.[15]

According to the Bureau's understanding of that section from the time it became effective in 1987 until December of 2002, the Bureau had the authority to "designate an offender directly to a community based facility to serve his or her sentence," though "ordinarily this is done only with the concurrence of the sentencing court." [16]

---

for inmates nearing the end of their sentences. The level of structure and supervision assures accountability and program opportunities in employment counseling and placement, substance abuse, and daily life skills." *Id.* at ¶ 1. For others, committed for short terms either entirely or largely in CCCs, their programs are meant to punish while allowing the inmate to retain employment and some contacts with the community. Ms. Howard is in the latter category of inmate. To avoid the common connotation associated with the term "halfway house," the court will refer to

these penal institutions as "community confinement centers" or "CCCs."

**14.** 18 U.S.C. § 3553(b).

**15.** 18 U.S.C. § 3621(b).

**16.** U.S. Department of Justice, Federal Bureau of Prisons, *Judicial Resource Guide to the Federal Bureau of Prisons*, 16 (2000). *See also,* Federal Bureau of Prisons, Policy Statement 7310.04, *Community Corrections Center (CCC) Utilization and Transfer Procedure*, ¶ 5.

As these remarks make perfectly clear, the Bureau's policy was that its discretion under this statute was far more expansive than the discretion of the district courts.

Indeed, it would have to be in order to commit a defendant like Ms. Howard, convicted of a Zone D felony, directly to a CCC. Conversely, the discretion of the district courts is constrained by statute to follow the Sentencing Guidelines ("Guidelines") promulgated by the United States Sentencing Commission ("Commission").[17] That statute provides:

> The court shall impose a sentence of the kind, and within the range, referred to in subsection (a)(4) unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.

Guideline § 5C1.1(f), in turn, provides that "[i]f the applicable guideline range is in Zone D of the Sentencing Table, the minimum term shall be satisfied by a sentence of imprisonment." [18]

Compare the applicable Guideline for a Zone C felony:

If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by—

> (1) a sentence of imprisonment; or
>
> (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.[19]

As this language is widely understood, the distinction it embodies between imprisonment and commitment to a CCC requires district courts to impose imprisonment in institutions like prisons or jails, rather than CCCs, for at least half the sentences of all Zone C felons.

Similarly, Zone D felons who must be given a "sentence of imprisonment," with no provisions whatsoever made for terms served in CCCs, cannot be committed directly to CCCs by the district courts.[20] Judges may, however, direct placement in a CCC as a condition of supervised release *after* a term of imprisonment or in lieu of imprisonment as a condition of probation for Zone A and B felons.[21] It is only when

---

**17.** 18 U.S.C. § 3553(b).

**18.** UNITED STATES SENTENCING GUIDELINES MANUAL § 5C1.1(f).

**19.** UNITED STATES SENTENCING GUIDELINES MANUAL § 5C1.1(d).

**20.** *See United States v. Serafini*, 233 F.3d 758, 777 (3d Cir.2000) ("it is true that under section § 5C1.1 of the Guidelines, "community confinement" cannot constitute "imprisonment" for purposes of fulfilling the requirement that one-half of a split sentence be satisfied by imprisonment"); *United States v. Adler*, 52 F.3d 20,21 (2d Cir.1995) ("We agree with the government that the district court's interpretation of Sections 5C2.1(d) and (e) is erroneous. 'Imprisonment' and 'community confinement' are not synonyms"); *United States v. Swigert*, 18 F.3d 443, 445 (7th Cir. 1994) ("Section 5C1.1 plainly draws a distinction between 'imprisonment' and either community confinement or home detention").

**21.** *See United States v. Jalili*, 925 F.2d 889, 892 (6th Cir.1991) ("[W]e read Guideline § 5C1.1(d), which states that 'the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that *includes a term of supervised release with a condition* that substitutes community confinement or home detention according to the schedule of § 5C1.1(3),' to mean that community confinement may be included as a condition during the term of supervised release") (emphasis in opinion).

it comes to the term of imprisonment itself that judges cannot decide on the place it will be carried out.

But this is a general disability of the courts. The relevant statutory scheme grants exclusive authority to the Bureau to decide where a convict will serve her term of imprisonment. The constraints on judges concern the threshold issue of whether the convict is sentenced to imprisonment and committed to the Bureau in the first place-as opposed to a sentence of probation or a fine, where no commitment occurs. For all, and only, those convicts who are sentenced to imprisonment are committed to the custody of the Bureau.[22] Thus, once committed, it is up to the Bureau to decide just where the convict's sentence will be served.[23]

This fact would explain why the Commission's Guidelines even discuss the notion of community confinement at all. The applicable Guidelines provisions deal not with whether a court could designate any specific place of imprisonment, because they can't, but rather with the courts' authority to sentence convicts to terms of supervised release or probation, which only applies to Zone A and certain Zone B felons. Over these two types of sentences, the courts have the requisite authority under the Guidelines to direct that the sentence be served in a CCC or by home detention. This is in stark contrast to the inability of the judiciary to designate the place where terms of imprisonment will be served.

According to the well-established practice and policy in effect at the time of Ms. Howard's sentencing, only the Bureau could deviate from these constraints upon the judiciary. But, that longstanding practice was challenged only two months after Ms. Howard began serving her time at Bannum Place. The Department of Justice commissioned a memorandum from the Office of Legal Counsel ("OLC") seeking an opinion whether the Bureau had all the discretion it supposed itself to have. As the OLC read the statute and related documents, the entire practice was "unlawful." It concluded that rather than grant the Bureau complete discretion in assigning prisoners, 18 U.S.C. § 3621 actually cabins its discretion within the same constraints that are placed on the federal judiciary by the Sentencing Commission. In a sense, the OLC has, with respect to sentencing discretion, assigned the judiciary and the Bureau as bunkmates under the guidance of the Sentencing Commission's camp counselor.

This change in policy took effect rapidly right around the Christmas holidays of 2002. Principal Deputy Assistant Attorney General M. Edward Whelan III of the OLC released a memorandum opinion entitled "Bureau of Prisons' Practice of Placing in Community Confinement Certain Offenders Who Have Received Sentences of Imprisonment" ("OLC Memo"), on December 13, 2002.[24] The OLC Memo concluded that the Bureau acted unlawfully in placing Zone C and Zone D felons directly into CCCs.

On December 20, 2002, Kathleen Hawk Sawyer, then-Director of the Bureau, sent her own memorandum to federal judges informing them of the conclusion of the OLC Memo and that the Bureau no longer would follow its prior practice. Under a new Bureau "policy," future felons sen-

---

**22.** *See* 18 U.S.C. § 3621(a).

**23.** *See* 18 U.S.C. § 3621(b).

**24.** *See* Memorandum Opinion for the Deputy Attorney General, *Bureau of Prisons Practice* *of Placing in Community Confinement Certain Offenders who have Received Sentences of Imprisonment,* (hereinafter "OLC Memo") available at <*http://www.usdoj.gov/olc/bopimprisonment2.htm*> (visited February, 10, 2003).

tenced to terms of imprisonment would never be committed directly to CCCs under any circumstances and regardless of what sentencing judges recommend. Though the OLC Memo does not discuss the matter, it also appears that the new "policy" applies equally to Zone B felons, or any felon who is sentenced to a term of imprisonment, because it is the Government's position that the phrase "term of imprisonment" as it appears in 18 U.S.C. § 3621 does not include time spent in CCCs.[25]

Also buried at the bottom of that memorandum was the following notice:

> This procedure change will be implemented prospectively, with the following exception. Inmates designated to CCCs who, as of December 16, 2002, had more than 150 days remaining to serve on their prison terms, will be re-designated by the Bureau to prison institutions.

Neither the memorandum nor any other communication provided to this court has offered to explain the rationale for the determination that the new "policy" should be applied in a selectively retroactive manner.[26] Nevertheless, retroactively applied it was. In yet another memorandum,[27]

dated December 30, 2002, Callie P. Farr, Community Corrections Manager, informed Ms Howard that:

> [Y]ou will be re-designated by the Bureau of Prisons (Bureau) to a prison or jail institution within the next 45 days, but not sooner than 30 days from receipt of this notice, for continued service of your prison sentence.
>
> Your transfer results from a Bureau procedure change, which complies with recent guidance from the U.S. Department of Justice's Office of Legal Counsel (OLC), finding that the term "community confinement" is not synonymous with "imprisonment."

This memorandum also informed Ms. Howard that the "policy" would be applied retroactively—a point she no doubt picked up in reading the first sentence. Though it explained the decision to change the discretion policy-insofar as the synonymy argument is an explanation-it did not provide any rationale for its retroactivity. The memorandum concluded by informing Ms. Howard that "[i]f you are dissatisfied with this decision, you may challenge it through the Bureau's administrative remedy program." [28]

---

**25.** That the "policy" also applies to Zone B felons is particularly important for any persons who commit a felony that does not allow for probation. Otherwise, courts may sentence to Zone B felons, along with Zone A felons to "a sentence of probation that includes a condition or combination of conditions that substitute intermittent confinement, community confinement, or home detention." Under the Government's latest reading of 18 U.S.C. § 3621(b), those Zone B felons whose crimes do not permit probation as a sentence will serve the vast majority of their terms in a federal prison, even those terms drawn in weeks rather than months.

**26.** Briefs from the Government indicate that the line is drawn at convicts who had 150 days or more remaining on their sentences out of a concern that the Bureau not be forced to move convicts from CCCs to pris-

ons, only to have to return them in very short order. That may or may not be the case. It is axiomatic that assertions in legal briefs are not evidence. But, in this case, the Government would not be under any burden to produce evidence that it has a rational basis for its action even if its action were challenged on equal protection grounds. That burden is upon Ms. Howard. It bears noting, however, that the purported rationale for distinguishing among CCC-committed convicts based on the time left on their sentences has absolutely no bearing whatsoever on the reasonableness of applying the new "policy" retroactively in the first instance. No one has offered any explanation of that decision.

**27.** Howard's Exhibit B.

**28.** *Id.*

Immediately after receiving this memorandum, Ms. Howard challenged the "policy" through the Bureau's administrative remedy process. The Bureau denied Ms. Howard's initial challenge, and she subsequently appealed. Although a ruling has still not been issued on her appeal as of the date of this Ruling, the Bureau sought to transfer Ms. Howard from Bannum Place to the federal corrections facility on January 30, 2003 anyway and still seeks to transfer her post haste.[29] Accordingly, on January 28, 2003, Ms. Howard filed a Motion to Vacate, Set Aside and/or Correct her Sentence and a Motion to Stay her transfer. This court issued an Order granting a TRO on that same day.

Since the issuance of that TRO, Ms. Howard has filed a civil action alleging violations of several laws of the United States, including the APA. She is seeking a preliminary and/or permanent injunction to prevent the reassignment from taking place. In the alternative, she asks this court to vacate her sentence and re-sentence her under 28 U.S.C. § 2255.

**29.** In fact, were it not for this court's immediate intervention at 3:30pm on Friday, February 21, 2003–Ms. Howard would have been transferred on Monday, February 24, 2003. Despite the entry of a TRO and the Bureau's notice thereof, someone issued a transfer order for Ms. Howard in violation of the TRO and unbeknownst to counsel for the Government in this case. Fortunately, the matter resolved itself upon the court's issuance of a Minute Entry and numerous phone calls by counsel for both sides. However, the court hopes that its orders are complied with in the future, as failure by the Bureau, the Department of Justice, their agents, assigns, designees, officers, servants, employees, or officials, to do so will very likely result in a contempt proceeding.

**30.** The court cannot accept that it has jurisdiction under either 18 U.S.C. § 3582 or Rule 35. Section 3582 specifically allows the district courts to modify sentences of imprisonment that have already been entered. But, it limits the availability of this remedy to instances in which either (1) the Sentencing

## II. JURISDICTION

The Government asserts that this court does not have jurisdiction to hear Ms. Howard's complaints about her treatment under the new Bureau "policy." Ms. Howard, meanwhile, proposes several possible bases for the court to exercise its authority. First, she argues, the court may take action under 18 U.S.C. § 3582(c) or Federal Rule of Criminal Procedure 35 to modify her sentence in the light of the subsequent administrative "clarifications" of the binding law. Second, the court may exercise its jurisdiction under 28 U.S.C. § 2255 to hear any claim attacking the validity of her sentence or conviction. Finally, she asserts that the court has federal question subject matter jurisdiction under 28 U.S.C. § 1331 to hear her claim that the Government has violated the her rights under the APA.

Before deciding which procedural mechanism allows the court to act on Ms. Howard's case, the court must distinguish her claims and the actions of which they complain.[30] As discussed above, Ms. Howard's

Commission has reduced the sentencing range for the crime of which a defendant has been convicted; or (2) the Director of Prisons makes a motion to reduce a sentence. Neither of those circumstances is present in this case. The problem here is that the Bureau, after exercising its discretion in setting the parameters of Ms. Howard's sentence, has changed course and imposed harsher terms for no particularized reason. The Director of Prisons has made no representations to this court whatsoever.

Similarly, Rule 35 of the Federal Rules of Criminal Procedure does not afford the court the power to change Ms. Howard's sentence. That Rule allows courts to correct clear sentencing errors on their own motions within seven days of the entry of the sentence. It also provides that the government may make a motion to reduce an inmate's sentence for "substantial assistance" in convicting other malfeasors. *See* FED. R. CRIM. PRO. 35. This court entered Ms. Howard's sentence in August of 2002. The time has clearly passed to find clear error, and the Government has

primary complaint concerns a series of actions taken by various bureaucrats within various branches of the Department of Justice. She objects to the imposition of a new "policy" upon the procedures of the Bureau that issued from the Department of Justice.

That new "policy" was based wholly, as far as the court can determine, on the OLC Memo. The OLC Memo expresses the opinion that it is unlawful for the Bureau to place convicts directly in CCCs rather than in penal facilities such as prisons or jails.[31] She objects to this interpretation as well as the method of its adoption. Ms. Howard also objects to the separate decision, apparently taken by another official at the Department of Justice or the Bureau, to apply this "policy" retroactively so that it affects people like herself, who was well into her term at a CCC by the time she received notice that she would be transferred into a federal prison.

Her complaints, already legion, march on. She also claims that the complained of bureaucratic declaration and the decisions that seek to effectuate it have infected the validity of her initial sentence. They have done so, she argues, by uprooting and throwing out the settled background assumptions against which the court exercised its discretion at the time it made its sentencing decision. She urges that the new "policy" vitiates the court's intentions in imposing the sentence it did.

Then, Ms. Howard challenges the validity of several actions of several individuals that will, left unchanged or unchecked and taken together, take her out of her community and throw her into a prison, despite initial judicial and agency determinations that to do so would not be in anyone's best interest in this case. Some of these acts are administrative and may be attacked directly insofar as they affect the Ms. Howard's interests. The same administrative acts may be attacked insofar as they affect the manner in which her sentence will be served. Others concern the imposition of Ms. Howard's sentence itself.

However, only those claims that attack the validity of Ms. Howard's sentence can be brought here under 28 U.S.C. § 2255. Her complaints regarding the manner of her imprisonment must be filed via a petition for the writ of habeas corpus under 28 U.S.C. § 2241 in the Middle District of Florida, where she is serving her term.[32] The distinction between the two habeas causes of action is clear. Both offer post-conviction relief, but the relief available and the court that a prisoner must petition are often distinct.

## A. Jurisdiction under 28 U.S.C. § 2255

■ A 28 U.S.C. § 2255 petition for post-conviction relief allows an inmate to attack the validity of a conviction or sentence collaterally and must be sought in the sentencing court.[33] Section 2255 reads:

A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution

---

made no additional motion to reduce her sentence.

31. See OLC Memo, supra note 24.

32. As it turns out, she has filed such a claim with that court.

33. See Pack v. Yusuff, 218 F.3d 448, 451 (5th Cir.2000); see also United States v. Jordan, 915 F.2d 622, 629 (11th Cir.1990); Doganiere v. United States, 914 F.2d 165, 169 (9th Cir. 1990); United States v. Long, 787 F.2d 538, 539 (10th Cir.1986); Higdon v. United States, 627 F.2d 893, 897 (9th Cir.1980); Grimes v. United States, 607 F.2d 6, 9–10 (2d Cir.1979).

or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

A motion for such relief may be made at any time.

[...]

If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge [or resentence the prisoner] or grant a new trial or correct the sentence as may appear appropriate.[34]

Among Ms. Howard's assertions is the claim that the subsequent change in the law-even assuming it was legitimate-undermined the validity of her sentence. This court is the proper court to hear this claim because it is the here that her sentence was imposed in the first place. Consequently, as an initial matter, Ms. Howard has brought the right kind of claim to the proper court.

There is, however, one remaining potential barrier to the court's taking jurisdiction over this matter under 28 U.S.C. § 2255. That is the Government's argument that this court does not have jurisdiction to hear a section 2255 claim because, even if Ms. Howard has been wronged, the quantum of that wrong is insufficient to warrant review under the federal habeas statute. A section 2255 remedy requires that the wrong be constitutional, jurisdictional, or of fundamental unfairness. That, the Government argues, Ms. Howard cannot do, and it refers the court to the Supreme Court's decision in *United States v. Addonizio*.[35]

*Addonizio* presents facts that are somewhat similar to those in this case. In 1970, Mr. Addonizio, once the Mayor of Newark, New Jersey, found himself up for sentencing after being convicted of 63 counts of extortion and one count of conspiracy to extort. The presiding judge sentenced Mr. Addonizio to a ten-year term of imprisonment.[36] He made this sentence, he later said, under the impression "that petitioner would be actually confined for a period of approximately three and one-half to four years of the ten-year sentence." [37]

The district judge formed this expectation based on the "fact that [Mr. Addonizio] was a first-offender and that there appeared to be little probability of recidivism" as well as his understanding that these were the primary factors used to determine when and whether to offer parole to a convict.[38] As it turned out, the Parole Commission frustrated the district judge's expectations by adopting new parole procedures. Specifically, the Parole Commission determined that the gravity of the offense should be a significant factor at parole hearings. The Parole Commission started using its new guidelines on a trial basis in 1972, published them in the Federal Register and began using them throughout the country in 1973, and later codified them at 28 CFR § 22.20 (1978).[39]

---

**34.** 28 U.S.C. § 2255.

**35.** 442 U.S. 178, 99 S.Ct. 2235, 60 L.Ed.2d 805 (1979).

**36.** *Addonizio*, 442 U.S. at 180, 99 S.Ct. 2235.

**37.** *Id.* at 181 n. 3, 99 S.Ct. 2235.

**38.** *Id.*

**39.** *Id.* at 182 n. 4, 99 S.Ct. 2235.

Based on the gravity of Mr. Addonizio's offenses—extreme breach of the public trust—the Parole Commission twice rejected his applications for parole when he applied in 1975.[40] Mr. Addonizio brought a motion under section 2255 to vacate and resentence. The sentencing judge reduced his sentence to time served and the Second Circuit affirmed.

The Supreme Court, however, reversed this decision on the ground that the district court did not have jurisdiction to hear the matter because "subsequent actions taken by the Parole Commission—whether or not such actions accord with a trial judge's expectations at the time of sentencing—do not retroactively affect the validity of the final judgment itself." [41] The Supreme Court pointed out that "an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment" because the interests of finality and judicial economy require that closed cases be reopened only for very serious reasons.[42]

According to the Court, only three kinds of reason are sufficient: (1) claims of constitutional error; (2) claims that the court lacked jurisdiction; and (3) claims that the court committed an error of fact or law of a fundamental character that "rendered the proceeding itself irregular and invalid." [43] The Supreme Court's holding and rationale compel the same result in this

case, the Government argues, because this court's expectations are no more entitled to be carried out than were the expectations of the district judge in *Addonizio*. It argues that, as a matter of law, the later activities of the Department of Justice and the Bureau could not have infected the proceedings in this court so fundamentally as to give this court jurisdiction to hear the claim.

The court respectfully differs with the Government on this matter. There are many distinctions between the facts of *Addonizio* and the facts of this case. The district judge in *Addonizio* merely expected that the Parole Commission would operate under its old rules. His reliance was in the nature of an idle expectation based on an understanding of "how things work." Moreover, the Parole Commission followed the requisite rulemaking procedures and eventually promulgated rules regarding the grant of probation that frustrated the district judge's intentions when, four or five years *after* the sentencing the Parole Commission applied those rules to Mr. Addonizio.

In this case, however, the court was not merely or idly speculating. The Bureau was on record that it had the discretion to commit certain classes of convict to imprisonment in CCCs. It published that view in 1998 in Policy Statement 7310.04.[44] It has also published the view as recently as 2000 in a reference manual for the judiciary.[45]

---

**40.** *Id.* at 182, 99 S.Ct. 2235.

**41.** *Id.* at 190, 99 S.Ct. 2235.

**42.** *Id.* at 184–85, 99 S.Ct. 2235.

**43.** *Id.* at 185–86, 99 S.Ct. 2235.

**44.** PS 7310.04, *Community Corrections Center(CCC) Utilization and Transfer Procedure,* ¶ 5 (12/16//1998) ("[T]he Bureau is not restricted by § 3624(c) in designating a CCC or an inmate and may place an inmate in a CCC for more than the 'last ten percentum of the term,' or more than six months, if appropriate.")

**45.** U.S. Department of Justice, Federal Bureau of Prisons, *Judicial Resource Guide to the Federal Bureau of Prisons* at 15–16 (2000) ("The Bureau may designate an offender directly to a community based facility to serve his or her sentence, but ordinarily this is done only with the concurrence of the sentencing court."). That same publication informs members of the judiciary of the kinds of convicts who might get assigned to CCCs:

> Protecting public safety is the first priority when an inmate is considered for participation in community programs. The following is the profile of a typical offender designated directly to a CCC.

U.S. Attorneys, now compelled to spend hours fighting to move the affected convicts, once collaborated with the sentencing judges to ensure that these people were assigned to CCCs. In many instances, after having accomplished the goal of achieving these assignments, the U.S. Attorneys are now whipsawed by the new "policy" back into court to stand before the same judges in a much more adversarial position.

Also, unlike parole hearings, placement in a penal institution is a part of the sentencing process. In Ms. Howard's case, that process was fully completed and she was assigned to a CCC *before* the Government stepped in brandishing its new "policy." Conversely, in *Addonizio*, the felon was convicted and served some four or five years before he ever went before the Parole Commission-his process was not yet complete.

Additionally, no one in Ms. Howard's case was working off of mere expectancies. The Bureau, the U.S. Attorney's Office, the court, Ms. Howard, and her attorney all knew what would happen to her. She would be taken into custody at the Bureau, they would look at the particulars of her case, and given the nature of the crimes and the recommendation of the court, they would assign her to a CCC so that she could maintain her connections to her community while at the same time giving up much of her freedom in order to pay back her debt to that same community. And that is precisely what happened. Until, that is, a bureaucrat in an office in Washington D.C. determined that the entire legal world had been acting under the same shared "unlawful" fantasy for decades and acted to bring us all back into step with his vision of the law.

Ultimately, however, it is the judgment of this court that this phase of the analysis does not concern jurisdiction to hear these claims. The remarks about jurisdiction in *Addonizio* and propounded by the Government in this case concern the district courts' jurisdiction *to vacate sentences*, not their jurisdiction to *consider whether* the claimed violation is serious enough to warrant such a measure.[46]

In *Addonizio*, the Supreme Court wrote, "[u]nder § 2255, the sentencing court is *authorized to discharge or resentence* defendant if it concludes that it 'was subject to collateral attack.' "[47] This remark does not indicate that the court does not have jurisdiction to hear the due process claim. Instead, it indicates that, having heard the claim and decided that the alleged injury is not of constitutional magnitude, the court cannot reclaim jurisdiction over the sentence and alter it anyway.

Courts that have rejected due process claims in section 2255 cases make this point plainly evident.[48] Moreover, the court has been referred to three recent cases that reached and rejected the merits

— Ordinarily sentenced to 6 months or less.
— Not involved in large-scale drug or property offenses.
— Has no detainers or pending charges.
— Has no history of serious violent behavior or firearms offenses.
— Has no history of sex crimes.
— No medical or mental disorder requiring ongoing treatment.
— Is not a deportable alien.
— Has no history of threats against government officials.

— Has no known memberships with disruptive groups or affiliations with major organized criminal enterprises.
*Id.* at 16.

**46.** *See Addonizio*, 442 U.S. at 185, 99 S.Ct. 2235 (emphasis added).

**47.** *Id.*

**48.** *Addonizio*, 442 U.S. at 185–87, 99 S.Ct. 2235; *United States v. Dragna*, 746 F.2d 457, 458 (9th Cir.1984); *Jalili*, 925 F.2d at 892–93.

of the due process claims brought by complainants under this new "policy."[49] All three refer to the governing due process standard for fairness at sentencing hearings—that a sentencing within Guideline limits can be altered if the judge relied on materially false information in imposing the sentence—and all three reject the due process argument based in part on the claim that these courts did not in fact rely on the former Bureau practice and policy of direct CCC commitments.[50] Therefore, this court concludes that the Government's jurisdictional arguments are more properly considered arguments on the merits and will consider them as such.

### B. Jurisdiction under 28 U.S.C. § 1331

Ms. Howard has stated claims under the APA as well. She argues that the new "policy" is actually a substantive rulemaking that could not be put in place until the Bureau undertook the notice and comment procedures required by section 552 of the APA, even if it were an acceptable interpretation of the statute. She also claims that the Bureau's "policy" is based on a clearly erroneous interpretation of the Crime Control Act of 1984 and thus, it is unenforceable against her. Because both of these claims state a cause of action "arising under" the laws of the United States, the court has jurisdiction to hear these claims under 28 U.S.C. § 1331.[51]

### C. Exhaustion of Administrative Remedies

■ In its most recent filing with the court, the Government has asserted another jurisdictional argument based on the "exhaustion of remedies" doctrine.[52] Unlike subject matter jurisdiction, there is an exception to the jurisdictional requirement that Ms. Howard exhaust her administrative remedies before bringing suit. Moreover, the court finds that the exception, namely futility, applies here.

The Government claims that the court cannot review the Bureau's agency action or Ms. Howard's sentencing because she has not exhausted her administrative remedies. The Fifth Circuit has held that before bringing habeas claims, "a federal prisoner seeking only injunctive relief must first exhaust the administrative remedies provided by the Bureau of Prisons."[53] Similarly, to challenge an agency action under the Administrative Procedures Act, that action must be a "final agency action."[54] The Bureau has procedures available that would allow her to appeal her re-designation. Those procedures are provided at 28 C.F.R. §§ 542.10–542.19.

---

**49.** *United States v. Schild,* 2003 U.S. Dist. 1703, 2003 WL 260672 (D.Kan.2003); *United States v. Herron,* 2003 WL 272170, 2003 U.S. Dist. LEXIS 1932; *United States v. Andrews,* 240 F.Supp.2d 636 (E.D.Mich.2003).

**50.** *See Schild,* at *3 (D.Kan.2003)("[E]ven if the court had known that defendant would not qualify for work release, the court would have issued the same sentence. In other words, the alleged 'misinformation' was not 'material' "); *Herron* at *2 ("This court would render the same sentence even knowing the change in interpretation of the guidelines"); *Andrews,* at 639 ("Whether the B.O.P. would accept the court's recommendation was not

material, nor even a factor, to the court's sentence of 7 months imprisonment").

**51.** *Walker v. Washington,* 627 F.2d 541, 545 (D.C.Cir.1980); *see also Pickus v. Bd. of Parole,* 507 F.2d 1107, 1109–11 (D.C.Cir.1974) (holding that prisoners can challenge agency actions directly under the APA); *Brown,* 528 F.2d at 1054.

**52.** Docket No. 116.

**53.** *Rourke v. Thompson,* 11 F.3d 47, 50 (5th Cir.1993).

**54.** 5 U.S.C. § 704.

The administrative appeals process has three steps. First, the inmate must submit a "formal written Administrative Remedy Request, on the appropriate form (BP–9)" with the Community Corrections Manager ("CCM") twenty days from the act challenged.[55] The CCM has 20 days to respond to the request.[56] The inmate then has twenty more days to appeal to the Regional Director,[57] who has thirty days to respond.[58] If the inmate is still dissatisfied with the result, she may appeal to the General Counsel within an additional thirty days.[59] The General Counsel has forty days to respond.[60] Ms. Howard admits that she has begun taking these steps, but the process has not been completed. Thus, the Government argues, she admits that she has no case before this court.

The court, on the other hand, finds that Ms. Howard need not continue tilting at the administrative windmills in her particular case. While the Government is correct that the exhaustion doctrine normally bars direct resort to the courts, that is not true where pursuing administrative remedies would be futile, "because it is clear that the claim will be rejected."[61] Where an agency has adopted a new rule or policy and announced that it will follow that policy, especially where that policy has its origin above the Bureau's General Counsel Office, it is pointless to require a complainant to follow the administrative procedure.

This result is dictated by the Government's unwavering position that the Bureau's old practice was "unlawful," which means that the people who would review Ms. Howard's claims in the Bureau have absolutely no power to alter her designation. Moreover, the interpretation underpinning the new "policy" was handed down from on high in the Department of Justice. Thus, it appears clear to the court that an administrative appeal could only work to delay this matter.[62]

In fact, the court believes that an administrative appeal would be more than futile in this case; it would completely destroy any hope that Ms. Howard has of avoiding redesignation and transfer to a federal prison. Even if Ms. Howard continued her appeals in the administrative fora in no time at all, the Bureau would have at least ninety days, all together, to respond to her requests for relief. Additionally, even though she filed a Request for Administrative Remedy soon after the very day she received her redesignation letter, she is still in the middle of her first appeal and the Bureau wants to shuttle her off to prison anyway. Thus, not only is it evident that she would not receive relief on appeal, it is also evident that she would be sent to prison and will serve for some months before she ever would have had an opportunity to bring her claim before a tribunal—a federal district court—that could actually afford her relief.

**55.** 28 C.F.R. § 542.14(a).

**56.** 28 C.F.R. § 542.18.

**57.** 28 C.F.R. § 542.15(a).

**58.** 28 C.F.R. § 542.18.

**59.** 28 C.F.R. § 542.14(a).

**60.** 28 C.F.R. § 542.18.

**61.** *Patsy v. Florida Int'l University*, 634 F.2d 900, 904 (5th Cir.1981), *reversed on other*

grounds by *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172; *see also DCP Farms v. Yeutter*, 957 F.2d 1183, 1189 (5th Cir.1992).

**62.** *See Tasby v. Pratt*, 2002 WL 1160071 at *2 (N.D.Tex.2002) ("[W]here, as here, the Bureau has adopted the policy and instructed its staff in the form of a Program Statement that inmates are ineligible for early release under the circumstances of this case, the court finds that presentation of Tasby's claims to the Bureau at the regional and national levels would, in fact, be futile").

And of course, Ms. Howard could not have exhausted her administrative remedies in no time at all. It is entirely likely she would be released, or nearing release before she ever got to federal court. By that time, the matter will likely become moot. Under no conception of justice and due process is that an acceptable result. Accordingly, the court finds that Ms. Howard need not have exhausted the administrative appeals process and may pursue her claims in this court.

The Government also argues that the exhaustion requirement is stricter than normal because the Prison Litigation Reform Act ("PLRA") imposes a greater exhaustion burden on prisoners than what is required of other citizens. That Act states, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." [63] While it is certainly true that this provision does destroy the futility exception in some cases, it is equally certain that it does not do so here. Much like the general futility exception to the exhaustion of remedy requirement, where a petitioner not only is unable to prevail by going through the proper procedures as a matter of plain agency policy, but by doing so would be completely deprived of any hope of relief, the exhaustion requirement under the PLRA does not bar relief in the courts. [64]

The reason for this rule is that where futility of such an extreme sort is present, the administrative remedies either do not exist or they are *de facto* exhausted. The

Supreme Court recognized this result as a presupposition of the terms "available" and "remedy" in the PLRA. [65] "[S]ome redress for a wrong is presupposed by the statute's requirement of an 'available' 'remed[y]'; neither [party] argues that exhaustion is required where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." [66]

Therefore, if the court believes the Government will stick to its oft repeated assertion that the old Bureau practice and policy was "unlawful," then the court can safely conclude that the administrative officials within the Bureau lack the authority to offer Ms. Howard relief. Hence, the exhaustion requirement is therefore satisfied and Ms. Howard may properly bring her suit in this court.

## III. PRELIMINARY INJUNCTION STANDARD, ANALYSIS, AND CONCLUSIONS

■ In order to prevail on her motion for preliminary injunction under either of her causes of action, Ms. Howard must establish that: (1) there is a substantial likelihood that she will prevail on the merits; (2) there is a substantial threat that the she will suffer irreparable injury if the preliminary injunction is denied; (3) the threatened injury to her outweighs the threatened injury to the Government; and, (4) granting the preliminary injunction will not disserve the public interest. [67]

Ms. Howard presents claims under two very differing theories of law, however, a winning argument under either theory will entitle her to the issuance of a preliminary injunction. The critical question with re-

---

**63.** 42 U.S.C. § 1997e(a).

**64.** *See Johnson v. True,* 125 F.Supp.2d 186 (W.D.Va.2000).

**65.** *Booth v. Churner,* 532 U.S. 731, 736 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

**66.** *Id.*

**67.** *See Walgreen v. Hood,* 275 F.3d 475, 477 (5th Cir.2001) (citing *Sierra Club v. FDIC,* 992 F.2d 545, 551 (5th Cir.1993)).

gard to this motion for a preliminary injunction, is whether Ms. Howard can show that she has a substantial likelihood of success on the merits of her claims. All of the other factors, irreparable injury, balance of harms, and public interest weigh in her favor. For completeness, the court will briefly explore these factors first.

■ There is no doubt that Ms. Howard would be irreparably injured if she were transferred from Bannum Place. Any dignity she had managed to recover would be lost. She would suffer financially and would be joined in that fate by her extended family who rely on her for financial and emotional support. Were the court later to rule in her favor, she would essentially have no relief at all.

■ Similarly, the balance of harms favors Ms. Howard as well. By allowing her to remain at Bannum Place until a final ruling on the merits, she will be able to continue paying for the costs of her incarceration. Any governmental interest in transferring her is outweighed by the costs of doing so, and the costs of incarcerating her at a location where she will not be able

to continue paying the associated bill. Moreover, because the Bureau has already designated Bannum Place as the location of Ms. Howard's imprisonment and she has already served a third of her sentence there, there is no potential harm to the public interest in allowing her to remain there.

Indeed, the only particularized government evaluation of its own interests regarding Ms. Howard's incarceration is that provided by the Bureau in assigning her to Bannum Place in the first place. She has been a model prisoner, and allowing her to remain ensures that her ties to the community and her continued rehabilitation are not crippled. Surely the public interest in returning criminals to society as good citizens living life on the right side of the law outweighs the Bureau's interest in enforcing a new rule retroactively by transferring her to a new location for a few months. Additionally, any "tough on crime" message the Government wishes to send by making these redesignations has already made its dent in the national consciousness.[68]

---

**68.** *See* Dan Eggen, *White Collar Crime Now Gets Real Time*, WASHINGTON POST, January 7, 2003, at A6. This place seems as good as any that will come to ask the question that must hound any of the hundreds of people who now find themselves spending hours out of their days supporting, fighting, or evaluating this new policy: What is the point? The question has a special force in cases where the Government seeks to apply the policy retroactively. For, as the Supreme Court remarked in another context in *Addonizio*, "inroads on the concept of finality tend to undermine confidence in the integrity of our procedures. Moreover, increased volume of judicial work [...] inevitably impairs and delays the orderly administration of justice." *Addonizio*, 442 U.S. at 185 n. 11, 99 S.Ct. 2235. And indeed, that is what the courts see today. The court is told that 132 people are threatened with the recoil of bureaucratic activism. And each judge is surrounded by a bevy of lawyers, mainly busy people from

the United States Attorney's Office and the Federal Public Defender's Office who would gladly, the court imagines, not re-fight old sentencing battles. So again the question: What is the point? In response, the Government states that the Bureau's former practice-a practice that apparently dates back half a century uninterrupted—was "unlawful." Oh, what a blunt instrument that remark! If explanation the court has sought, exasperation it has surely found. For even beyond the lack of fairness and even beyond the waste of time and resources, the court still must ask-what comes of this new "policy?" If it were upheld, are judges really expected to march along unaffected by their awareness of it? No. As Judge Huevelle remarked in her opinion in a similar case, *Culter v. United States*, 2003 WL 184022 (D.D.C. 2003), judges know full well how all these provisions work together and fashion their judgments accordingly. If the motivation of the Department of Justice was to grab head-

Therefore, on the basis of the above and the Government's failure to offer any argument in opposition, the court concludes that Ms. Howard has met her burden, and a preliminary injunction ruling in her favor is warranted on these factors. The remaining factor that this court must resolve is whether Ms. Howard has demonstrated that she is substantially likely to prevail on the merits of her claims. Each of her claims will be addressed in turn.

## A. The APA Claims–Rulemaking

■ The majority of Ms. Howard's civil claims are encompassed by the APA. This is because the bulk of her federal constitutional claims are more properly considered as part of her 28 U.S.C. § 2241 claim, which has been brought in the appropriate United States District Court in the Middle District of Florida where she is incarcerated. As a general matter, the APA applies to all federal agencies, including the Bureau.[69] There are a few limitations to the applicability of the APA to the Bureau, however, contained in 18 U.S.C. § 3625. These limitations have no applicability in cases such as this, where the challenge is not an adjudication of an individual case, but instead, a challenge to a rulemaking.[70]

At the outset, the court observes that the "policy" change enacted by the Bureau by the stroke of a bureaucratic pen in the waning days of 2002 looks a whole lot like a "rule" for the purposes of the APA. The APA defines the term "rule" as "an agency statement of general or particular applica-

bility and future effect designed to implement, interpret, or prescribe law. . . ." The Bureau's new "policy" of prohibiting direct commitment of convicts to CCC's under any circumstances, and the redesignation of previously committed convicts like Ms. Howard because she had more than 150 days left to serve are most certainly "statement[s] of general applicability" designed to carry out the law.

■ Under ordinary circumstances, an agency that wishes to issue a rule must abide by the APA's notice and comment procedures. Additionally, although agency "interpretations" are not typically subject to notice and comment procedures,[71] when an interpretation departs from a long-standing agency practice, it too must be promulgated under the general APA notice and comment procedures.[72] There is no doubt that the new Bureau "policy" is the exact opposite from its past policy and practice with regard to direct CCC commitments. Thus, under either rulemaking theory, it is highly probable that the court could conclude that the Bureau has issued a "rule" that requires notice and comment.

The Department of Justice and the Bureau admit that they have not complied with the requirement for notice and comment. Therefore, Ms. Howard has shown a likelihood of success on the merits that the "rule," and its application, are invalid, thereby making a preliminary injunction on this issue warranted.

---

lines about longer sentences for minor white-collar criminals while in fact ensuring that in the long run their sentences are shorter, then congratulations are in order. This "policy" is just the trick. Otherwise, if the court may presume, perhaps the next time the Department of Justice or the Bureau decide that it's time to get religion, they will seek comment from without.

**69.** *See Harris v. Mut. of Omaha Cos.,* 992 F.2d 706, 712 (7th Cir.1993).

**70.** *See* S. Rep. 98–225, 149, 1984 U.S.C.C.A.N. 3182, 332; *Martin v. Gerlinski,* 133 F.3d 1076, 1079 (8th Cir.1998).

**71.** *See Venegas v. Henman,* 126 F.3d 760, 763 (5th Cir.1997).

**72.** *See Shell Offshore, Inc. v. Babbitt,* 238 F.3d 622, 630 (5th Cir.2001).

### B. APA Claims–Validity of the New Interpretation

■ Even if notice and comment were not required, the court still must consider whether the Bureau's "interpretation" leading up to its new "policy" was a permissible construction of the relevant statute. In reaching this determination, the question the court faces is whether confinement in a community corrections center is a form of imprisonment under the statute. If it is a form of imprisonment under 18 U.S.C. § 3621(b), then the Bureau would have a clear grant of statutory authority to exercise its discretion and place people convicted of Zone C and Zone D felonies directly to CCCs, despite the fact that federal district courts do not have that authority under the Guidelines.[73]

On the other hand, if such confinement is not a form of imprisonment, then the scope of the Bureau's discretion to designate places of imprisonment does not reach CCCs and the Bureau may not assign inmates to those institutions unless it acts under some other grant of authority. The court begins by noting that the Department of Justice appears to be the proper agency to undertake to interpret the statutory provisions concerning the Bureau.[74] As such, its interpretation may be due some measure of deference.

■ Review of an agency's interpretation of the statute it administers is typically a two step process. First, the court must consider whether "Congress has directly spoken to the issue."[75] "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."[76] If the court determines that the statute is ambiguous, however, then the court must determine the appropriate degree of deference given the nature of the agency's interpretation and evaluate the interpretation in that light.[77] Where, as here, the "policy" in question is only, in form at least, a "policy statement," this court owes the Department of Justice's interpretation some, but only some, deference.[78] Ultimately, however, the court finds that Ms. Howard is substantially likely to prevail on her claim that the interpretation by the Department of Justice that underpins the Bureau's new "policy" is inconsistent with the plain meaning of 18 U.S.C. § 3621.

The court looks first to the language of the statute that purports to give the Bureau some measure of discretion:

(a) A person who has been sentenced to a term of imprisonment ... shall be committed to the custody of the Bureau of Prisons. [ ... ]

(b) The Bureau of Prisons shall designate the place of the prisoner's imprisonment. The Bureau may designate any available penal or correctional fa-

---

**73.** As noted above, though the OLC Memo addresses only Class C and Class D felons, the Bureau "policy" and its rationale would, at least theoretically, apply equally to Class B felons.

**74.** 18 U.S.C. § 4001. The court notes that the Supreme Court has approved the Bureau as an interpreter of portions of the statute it administers. *See Reno v. Koray*, 515 U.S. 50, 60, 115 S.Ct. 2021, 132 L.Ed.2d 46 (1995) (approving the Bureau as the proper agency to interpret the Bail Reform Act).

**75.** *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837, 842, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

**76.** *Id.* at 842–43, 104 S.Ct. 2778.

**77.** *Id.* at 843, 104 S.Ct. 2778.

**78.** *See Koray*, 515 U.S. at 60, 115 S.Ct. 2021 ("But BOP's internal agency guideline, which is akin to an 'interpretive rule' that 'do[es] not require notice and comment is still entitled to some deference' since it is a 'permissible construction of the statute' ") (internal citations omitted).

cility that meets minimum standards of health and habitability.[79]

It could not be clearer from this language that Congress granted the Bureau a rather broad discretion to appoint the places where prisoners will serve their terms of imprisonment. Subsection 3621(a) directs that people who must serve terms of imprisonment be given over to the custody of the Bureau. The first sentence of subsection 3621(b) uses mandatory language to create a duty in the Bureau to do something with the prisoners in their custody, namely, to place them. The second sentence in that subsection uses language of empowerment which tells the Bureau where it may place such prisoners. According to that second sentence, the Bureau's discretion extends to "any available penal or correctional facility." Thus, the statute commits certain people to the custody of the Bureau, directs that the Bureau do something to place people so committed, and grants the Bureau the authority to choose the place of imprisonment from among available penal or correctional institutions.

In this language, there is no suggestion of any limitation on the Bureau's authority except that the facility chosen must: (1) be a "penal or correctional facility"; and, (2) meet "minimum standards of health and habitability established by the Bureau." There is no controversy over this later limitation on the Bureau's imprisonment power. Therefore, the only apparent limitation on the Bureau is that it choose a place that is a "penal or correctional facility." [80]

So, the question the court faces would appear to have evolved into the question whether community confinement centers are penal or correctional institutions. If they are, the statute plainly says that the Bureau may commit people sentenced to terms of imprisonment to them. On the direction and assurances of higher courts than this, the court will consider, for guidance, definitions of the terms "penal" and "correctional" to decipher what meaning to impute to those term in the statute. It becomes obvious, without going far, that a community corrections center is in fact a penal or correctional institution.

According to the *Oxford English Dictionary*, something is properly characterized as "penal" if it is:

1. Of, pertaining to, or relating to punishment. (a.) Having as its object the infliction of punishment, punitive; prescribing or enacting the punishment to be inflicted for an offence or transgression.... (c.) Having the nature or character of punishment; constituting punishment; inflicted as, or in the way of, punishment.... (e.) Used or appointed as a place of punishment. (f.) Involving, connected with, or characterized by, a penalty or legal punishment. (g.) Of, pertaining to, or subject to the penal laws, penal servitude, etc.[81]

Dictionary wars being what they are in the courts today, some would perhaps prefer the perspective of an American source. According to the *American Heritage Dictionary* "penal" means:

Of, relating to, or prescribing punishment, as for breaking the law. Subject to punishment; legally punishable: *a penal offense.* Serving as or constituting a means or place of punishment.[82]

---

**79.** 18 U.S.C. § 3621(a) & (b).

**80.** There are other apparent limitations in 18 U.S.C. § 3621(b) that the court will discuss later. None of these are proposed as evidence that the Bureau lacks discretion to make direct CCC designations.

**81.** Oxford English Dictionary. (J.A. Simpson and E.S.C. Weiner.2d ed., 1989) *available at* <http://www.oed.com> (visited Feb. 19, 2003).

**82.** The American Heritage Dictionary of the English Language, (Houghton Mifflin Co. 4th Ed.2000).

As either of these common definitions demonstrate, a penal facility is a facility that people are committed to as a form of punishment.

Meanwhile, to be "correctional" is defined somewhat unhelpfully by the *Oxford English Dictionary* as, "[o]f or pertaining to correction; corrective." [83] More helpfully, the *American Heritage Dictionary* tells us that, in the appropriate context, "correctional" means, "[p]unishment intended to rehabilitate or improve." [84] Thus, the court is again faced with a basic matter, namely, whether CCCs are facilities that serve the purpose of punishing, correcting, or rehabilitating prisoners. If they do, then it is apparently within the Bureau's authority to make direct commitments to them.

After review and reflection on this matter, the court finds that CCCs are facilities for the purpose of punishment, rehabilitation, and/or correction. Indeed, the court cannot imagine what other purpose these facilities might reasonably serve. This finding is consistent with the Bureau's own understanding of the function and purposes of CCCs.[85] In fact, even the Sentencing Commission has expressed that view in a joint report issued with the Bureau:

> Community correction centers (CCC) provide two program components within their facilities: a pre-release component and a community corrections component. [ . . . ] The community corrections component is designed to be sufficiently punitive to be a legitimate sanction.[86]

Moreover, the *Prison Litigation Reform Act,* relied upon by the Government to argue that Ms. Howard cannot bring her claim because she has not exhausted her administrative remedies, applies its exhaustion standard to "any jail, prison, or other correctional facility." [87] And, the Tenth Circuit has interpreted the phrase "correctional facility" to apply to the Colorado state counterpart to CCCs and thus to require that inmates in community correction centers exhaust their administrative remedies before bringing suit.[88] Thus, it appears quite compelling that the Bureau has the discretion to make direct commitments to CCCs.

Despite this apparently clear statutory grant of authority, the Government now informs the court that the Bureau's discretion is in fact limited. The Bureau can no more commit a person in its custody to a CCC than it could commit her to a turn on a merry-go-round. The reason, according to the Government, is that neither of these locations is a "place of imprisonment." This language, the Government argues, collapses the Bureau's discretionary powers before it ever comes time to decide among penal or correctional institutions. Therefore, under the Government's interpretation of the statutory language: (1) the courts send the Bureau people sentenced to terms of imprisonment; [89] (2) the Bureau must place them in places of imprisonment; [90] and, (3) the Bureau may choose the places of imprisonment from

---

**83.** OXFORD ENGLISH DICTIONARY, *supra* note 82.

**84.** THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE, *supra* note 83.

**85.** *See, e.g.,* Program Statement No. 7310.01 (deeming CCCs "penal or correctional" facilities).

**86.** Joint Report to Congress, United States Sentencing Commission and Federal Bureau of Prisons, *Maximum Utilization of Prisons*

*Resources,* at 9–10 (June 30, 1994)(hereinafter "Joint Report").

**87.** 42 U.S.C. § 1997e(a).

**88.** *Dmytryszyn v. Hickox,* 172 F.3d 62, 1999 WL 59622 (10th Cir.1999)(unpublished disposition).

**89.** *See* 18 U.S.C. § 3621(a).

**90.** 18 U.S.C. § 3621(b).

among the set of available penal or correctional facilities that qualify as places of imprisonment.[91]

There are several difficulties with this argument. In the first instance, it is deeply counterintuitive that the phrase "place of imprisonment" is meant to be a limitation upon what everyone acknowledges to be the much broader phrase "penal or correctional institution." Additionally, the statute does not simply speak of "penal or correctional" facilities; it speaks of *any* penal or correctional facility. Imagine a mother calling her child and saying, "On the way home, go to the store and pick up some Coke.[92] You can pick up any kind of soda you like." If on returning home the mother became angry at her child for picking up Mr. Pibb ™, everyone would properly regard the mother as irrational. If she really meant "Coca–Cola ™" by "Coke" as opposed to something more generic or general, then she would not have given her child the apparent discretion to choose any "soda" she liked. The general term in the second sentence only makes sense if the seemingly specific term in the first sentence had a broader meaning than might otherwise be apparent.

This is why the Government's interpretation based on the OLC Memo is implausible. According to the OLC Memo, Congress has told the Bureau: "Whenever the courts send you an inmate, put her in a prison or jail. You are free to choose from all the prisons, jails, and community confinement centers." The only sensible way to understand the interplay between the phrases "place of imprisonment" and "any penal or correctional facility" is to read the latter as giving content to the former, just as the phrase "any soda" gives content to the term "Coke" in the example above. Thus, what Congress has actually expressed to the Bureau is the following: "You must place inmates sent to you into some place of imprisonment. By that we mean, place them into a penal or correctional facility; you choose which one." So long as community confinement centers are viewed as penal or correctional facilities, they would also be "places of imprisonment" under the statute.

Moreover, the court finds that community confinement centers are "places of imprisonment" as that phrase is most naturally understood. The *American Heritage Dictionary* defines "imprisonment" as "[t]o put in or as if in prison; confine." The *Oxford English Dictionary* defines "imprisonment" as "[t]he action of imprisoning, or fact or condition of being imprisoned; detention in a prison or place of confinement; close or irksome confinement; 'forcible restraint within bounds'; incarceration." Placement in a CCC allows an inmate to leave the CCC for the purpose of employment, but otherwise requires the inmate to be in the CCC. As the joint report by the Sentencing Commission and the Bureau point out, "[e]xcept for employment and other required activities, offenders in the CCC component must remain in the facility at all times." [93]

The parties to this case agree that Ms. Howard travels to her job, Monday through Friday, receives limited one to three-hour passes to visit her family, attend counseling, or religious services on a weekly basis, but is otherwise confined to the Bannum Place. This most certainly qualifies as confinement as most people would understand it.

---

91. 18 U.S.C. § 3621(b).

92. It is very common for persons who reside in the southeastern portions of the United States to refer to all kinds of soda-pop as simply "Coke," in the same way that persons from other regions use more generic terms such as "soda-pop," "soda," or just "pop."

93. Joint Report *supra* note 87 at 10.

While community confinement centers no doubt are less confining than prisons or jails, they nevertheless impose heavily on the freedom of inmates to come and go as they choose. The inmates do not return to their homes. They do not set their own schedules. They are confined for all practical purposes and under the control of the Government through its agents. The *degree* of confinement is not determinative of *whether* these inmates are confined.[94] Therefore, the court cannot escape the conclusions that a term served in a CCC is a term of confinement and that a term of confinement is a term of imprisonment, as used in 18 U.S.C. § 3621.

Attention to the larger statutory context confirms this view. Section 3551 authorizes only three categories of sentence: (1) terms of probation, (2) fines, and (3) terms of imprisonment.[95] Subsection 3551(b) provides:

> An individual found guilty of an offense shall be sentenced, in accordance with the provisions of section 3553, to—
>
> (1) a term of probation as authorized by subchapter B;
>
> (2) a fine as authorized by subchapter C; or
>
> (3) a term of imprisonment as authorized by subchapter D.

Of these three kinds of sentences, community confinement clearly falls into the last category. Community confinement is neither a fine nor a form of probation. Under a term of probation, a convict is essentially free to come and go as she chooses. Community confinement center inmates live at these facilities. They may be free to hold jobs in the community, but they are not merely on supervised release. If community confinement is a valid form of sentence, then it is a form of imprisonment under the statute.

It does not matter that the federal district courts are constrained to a greater degree than the Bureau. Though courts have an institutional incentive to recognize the greatest scope for judicial authority, they also have an institutional duty to allow that other institutions surpass them when the law so requires. Thus, the court finds that the Bureau has greater authority to assign prisoners to CCCs than the court itself does. It is the job of the court, under the statutory scheme, to impose sentences. It is the job of the Bureau to decide where those sentences are to be served.

It is for this reason that the court finds the bulk of the reasoning of the Government's arguments based on the OLC Memo to be a series of *non sequiturs* because that document relies on a misconception of the authority of the Sentencing Commission. The Commission clearly has the statutory authority to limit the discretion of the federal district courts in sentencing matters. And, the federal district courts are explicitly directed to conform their sentences to the Sentencing Commission Guidelines.[96] But, the Commission's authority does not touch that of the Bureau and the Bureau's discretion is nowhere hemmed in by the Guidelines.

---

94. As Blackstone wrote, "Every confinement of the person is an imprisonment, whether it be in a common prison, or a private house, or even by forcibly detaining one in the public streets."

95. 18 U.S.C. § 3551(b).

96. 18 U.S.C. § 3553(c) ("The court *shall* impose a sentence of the kind, and within the range, referred to in subsection (a)(4) [referring to the kinds of sentence and sentencing range established by the Sentencing Commission] unless the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission").

This is because the Commission's enabling statute gives it authority only over the sentencing of the courts, not the decisions of the Bureau. Section 994(a) calls on the Commission to "promulgate and distribute to all courts of the United States and to the United States Probation System—(1) guidelines, as described in this section, for *use of a sentencing court* in determining the sentence to be imposed in a criminal case, including" whether to impose a sentence of imprisonment, probation, or a fine, the appropriate quantum of such punishment, whether to include a term of supervised release, and whether terms will run consecutively or concurrently.[97] No provision in the Commission's enabling statute even mentions *places* of imprisonment, much less the statutory section that purports to give the Bureau its authority. In fact, section 994 makes no mention of authority over the Bureau at all. The only reference in that section to the Bureau is as a partner.[98] Indeed, it is evident from the relevant statutes that the Sentencing Commission has authority over sentencing while the Bureau has authority over designating where and carrying sentences out. Therefore, the court concludes that the Sentencing Commission has no authority over placement matters and that its Guidelines are not binding on the Bureau.

Yet, the Government relies for its interpretation of "imprisonment" in 18 U.S.C. § 3621 largely on the way that the Sentencing Commission has used the terms "imprisonment" and "community confinement" in promulgating the Guidelines. The Government is specifically concerned that there be some measure of consistency between the language of Guideline § 5C1.1

and 18 U.S.C. § 3621. Subsection (d) of that Guideline provides:

> If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by—
> (1) a sentence of imprisonment; or
> II. a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.[99]

It is evident, the Government argues, that the Sentencing Commission does not regard placement in a community confinement center to be imprisonment. Otherwise, it would not allow placement in a CCC, only then to require that at least half of each term be satisfied by "imprisonment." If a CCC term were a term of "imprisonment," there would be no need for this caveat. Therefore, the Government concludes, service of a sentence in a CCC is not "imprisonment" under that Guideline.

As an initial matter, the court believes that the Government's interpretation is mistaken. As the court reads it, this particular Guideline treats community confinement as a subclass of imprisonment. When a court under Guideline § 5C1.1(d) decides it is appropriate to split the sentence of a person convicted of a Zone C felony, this Guideline actually allows the court to substitute a lesser for greater form of confinement. The Guideline commentary is helpful on this point.

For example, where the guideline range is 8–14 months, a sentence of four months imprisonment followed by a

---

**97.** 28 U.S.C. § 994(a)(emphasis added).

**98.** *See* 28 U.S.C. § 994(q) ("The Commission and the Bureau of Prisons shall submit to Congress an analysis and recommendations

concerning maximum utilization of resources to deal effectively with the Federal prison population.").

**99.** U.S. Sentencing Guideline § 5C1.1(d).

term of supervised release with a condition requiring four months community confinement or home detention would satisfy the minimum term of imprisonment required by the guideline range.[100] Thus, where the Guideline table requires a minimum *term of imprisonment*, the Guidelines are the federal courts to satisfy it by *either* service of the sentence in a prison *or* in a community confinement center.

While the Guidelines do draw a distinction here between community confinement and imprisonment, the more natural reading is that community confinement is a form of imprisonment rather than a distinct classification of punishment. The Guidelines say that a court may impose a "sentence of imprisonment that *includes* a term of supervised release with a condition that substitutes community confinement." This language suggests that community confinement is part of the term of imprisonment because the overall term is supposed to be a "term of imprisonment" and the Guidelines permit courts to impose a term of supervised release for half of that term.

But, the courts can only avail themselves of that option if they require that supervised release portion to be served in a CCC or by home detention. Thus, if one views time spent in a CCC is a term of imprisonment, then the Guidelines are actually requiring the courts to put these convicts in places of imprisonment for their entire sentence. So, while the Guidelines permit courts to have the added authority to designate a particular CCC in this "split sentence" scenario, the convict is still committed to the Bureau for the other half of the imprisonment term. Under the reading of the statute adopted by this court-and by the rest of the world before December of 2002-the Bureau would then have the discretion to place such convicts into either prisons, jails, or community confinement centers for that half of the imprisonment term.

In any event, the court need not find that the Sentencing Commission regards community confinement as a form of imprisonment to decide that the Government's interpretation based on the OLC Memo is impermissible because the Sentencing Commission does not have any authority over the Bureau. Even if the Sentencing Commission was steadfastly committed to the distinction between community confinement and imprisonment, that fact would not affect the discretion of the Bureau under 18 U.S.C. § 3621 because the Commission lacks the requisite authority.

The second source of authority proposed by the Government for its interpretation of 18 U.S.C. § 3621 are several judicial opinions interpreting the terms "imprisonment" and "community confinement" in the Sentencing Guidelines.[101] These citations are inapt for the same reason. If the

---

**100.** U.S. Sentencing Guideline § 5C1.1, Application Note 4.

**101.** *See Serafini*, 233 F.3d at 777 ("It is true that *under section § 5C1.1* of the Guidelines, "community confinement" cannot constitute "imprisonment" for purposes of fulfilling the requirement that one-half of a split sentence be satisfied by imprisonment"); *Adler*, 52 F.3d at 21 ("We agree with the government that the district court's *interpretation of Sections 5C2.1(d) and (e)* is erroneous."); *Swigert*, 18 F.3d at 445 ("*Section 5C1.1 plainly draws*

*a distinction* between 'imprisonment' and either community confinement or home detention"); *Jalili*, 925 F.2d at 892 ("[W]e *read Guideline § 5C1.1(d)*, which states that 'the minimum term may be satisfied by (1) a sentence of imprisonment; or (2) a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention *according to the schedule of § 5C1.1(3),*' to mean that community confinement may be included as a condition during the term of supervised release") (emphases added).

Sentencing Commission has no authority to constrain the Bureau, then judicial opinions interpreting the meaning of the Guidelines as they apply to the courts are irrelevant. These opinions address the question whether "community confinement" is "imprisonment" within the meaning of the Guidelines. It is a separate question whether community confinement is a form of imprisonment under a statute that fleshes out the concept of "place of imprisonment" by using the term "any penal or correctional facility." Hence, the OLC, and subsequently, the Government, were mistaken to rely so heavily for their interpretation on these decisions.

 The final source of authority relied on by the Government is 18 U.S.C. § 3624(c), which concerns pre-release custody. According to the OLC Memo, and subsequently, the Government, that section specifically constrains the Bureau's discretion to place inmates directly into community confinement centers. In fact, the Government's position is that this section demands that the Bureau never place anyone sentenced to a term of imprisonment of any kind to a CCC for more than ten percent of her term of imprisonment and, even then, never for more than six months. The statute reads:

> The Bureau of Prisons shall, to the extent practicable, assure that a prisoner serving a term of imprisonment spends a reasonable part, not to exceed six months, of the last 10 percentum of the term to be served under the conditions that will afford the prisoner a reasonable opportunity to adjust to and prepare for the prisoner's re-entry into the community. The authority provided by this subsection may be used to place a prisoner in home confinement.[102]

This portion of the Government's rationale is almost worth preserving for the marvelous irony it foists upon the world. As the court reads this subsection, Congress is directing the Bureau to do its level best to assure that everyone who has served time get a decent opportunity to go through a period of readjustment before being thrust back into the community.

Yet, the Government would have the court read this section as a stiff curb on the Bureau's ability to make such placements at all. The court finds this reading to be implausible. The statute clearly emphasizes the Bureau's duty to *ensure* a reasonable opportunity for a period of adjustment. It aims to relieve the burdens of direct release on our communities, the inmates, and their families. This section does not shrink the discretion granted the Bureau in 18 U.S.C. § 3621(b). Instead, it creates an obligation in the Bureau to consider alternative means of incarceration for limited periods that will facilitate the goal of seamless and permanent re-entry. This reading tracks precisely the one adopted by the Tenth Circuit. "[O]ur interpretation of § 3624(c) as a legislative directive focusing on the development of conditions to facilitate the inmate's adjustment to free society, whatever the institution of pre-release confinement, accepts as a premise that the broader statutory scheme concerning the Bureau's general placement authority remains intact and effective."[103]

The remaining subsections of 18 U.S.C. § 3624 reinforce this view. Subsection (a) directs the Bureau with respect to releasing inmates. Subsection (b) directs, among other things, that the Bureau provide a General Educational Development program for inmates who have not previously

---

**102.** 18 U.S.C. § 3624(c).

**103.** *Prows v. Federal Bureau of Prisons,* 981 F.2d 466, 470 (10th Cir.1992); *see also U.S. v.*

*Morales–Morales,* 985 F.Supp. 229, 231 (D.P.R.1997).

completed their high school educations. Subsection (d) directs the Bureau to provide released inmates with money, clothing, and transportation to ease re-entry. Finally, subsection (f) directs the Attorney General to direct the Bureau to adopt a mandatory functional literacy program. All of these requirements evidently are directed at the same goal of advancing rehabilitation to destroy recidivism. It makes absolutely no sense within this context to read subsection (b) as an unyielding tool of retribution.

The court also notes that the former Bureau practice of permitting certain convicts to serve their terms of imprisonment in CCCs is an extremely long standing one. The provisions that 18 U.S.C. § 3621 replaced were former 18 U.S.C. § 4082(a) & (b), which provided:

> (a) A person convicted of an offense against the United States shall be committed, for such term of imprisonment as the court may direct, to the custody of the Attorney General of the United States, who shall designate the place of confinement where the sentence shall be served.
>
> (b) The Attorney General may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether maintained by the Federal Government or otherwise, and whether within or without the judicial district in which the person was convicted, and may at any time transfer a person from one place of confinement to another.[104]

These provisions had their origin in a law first passed in 1930.[105] By all accounts, the change proposed by the Government, a change it infers from minor statutory changes and collateral agency rule making, would alter a sentencing landscape that existed long before the Sentencing Guidelines hit the scene.

Due to the expedited nature of these proceedings, the parties have not yet had the opportunity to present any detailed history of sentencing practices before 1987. The court is persuaded, however, that given the opportunity to do so at a hearing for a permanent injunction, Ms. Howard will be able to cement her position by providing such information. In any event, no one contests that the proposed change fundamentally alters the handling of certain classes of criminal convict. As discussed previously, the Bureau itself has long held that it had the authority to make direct designations to CCCs.

Additionally, the court's interpretation of the statute is further confirmed by the legislative history. The Senate Report indicates that 18 U.S.C. § 3621(b) follows the already existing practices of the Bureau. Specifically the report reads:

> Proposed 18 U.S.C. 3621(b) follows existing law in providing that the authority to designate the place of confinement for Federal prisoners rests in the Bureau of Prisons. The designated penal or correctional facility need not be in the judicial district in which the prisoner was convicted and need not be maintained by the Federal Government. Existing law provides that the Bureau may designate a place of confinement that is available, appropriate, and suitable. Section 3621(b) continues that discretionary authority with a new requirement that the facility meet minimum standards of health and habitability established by the Bureau of Prisons.[106]

---

**104.** *See Gale v. U.S. Dep't of Justice*, 628 F.2d 224, 229 (D.C.Cir.1980).

**105.** Act of May 14, 1930, Pub.L. No. 71–218, 46 Stat. 325.

**106.** S. REP. No. 98–225, at 141–42 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3183, 3324.

Three things are worth emphasizing from this passage. First, the committee report did not purport to change then-existing practices, but instead emphasized that the statute preserved them. Second, the report exchanges the term "place of confinement" for the term "place of imprisonment" when discussing the discretion of the Bureau. In fact, it does so twice. Third, the passage emphasizes the breadth of the Bureau's discretion and specifically notes where the new law will limit its existing discretion. This new restriction is that the place of confinement be "habitable."

The apparent lesson from this background information is twofold: (1) the practice challenged by the OLC Memo is not merely a practice of fifteen years standing under the Comprehensive Crime Control Act of 1984, it is a practice that predates that Act and has been with us for some half a century; and, (2) far from explicitly overriding that known practice— as of course it was and is within the power of Congress to do—the Crime Control Act of 1984 left that practice in place by leaving the statutory language untouched. If Congress had wanted to remove or restrict the Bureau's discretion in the manner that the Government now attempts to do by relying on the OLC Memo, Congress could have done so. It did not, as is evident from the commentary to the bill, as well as from the face of the statute itself.

Moreover, nowhere has the Government indicated that the Bureau has the authority to issue rules with retroactive effect. Such authority is required [107] in a case such as this where the Bureau wishes to redesignate an inmate such as Ms. Howard and elevate the level of her incarceration through no fault of her own. This is not merely a "secondary" retroactive effect as

the Government suggests in its briefs. Ms. Howard was designated to serve her term in Bannum Place House by the Bureau, and the Bureau now seeks to revoke that designation after she has served a third of her term.

Finally, the court rejects the Government's position that this change was "foreseeable," because the court has already concluded that the "interpretation" of the term "imprisonment" as proposed by the Government is not permissible because it is just plain wrong. It is never foreseeable that an administrative agency will misinterpret its own statute to this degree. Moreover, there has been no evidence presented that the prior interpretation of the word "imprisonment" had ever been challenged for the purposes of the Bureau exercising its discretion to commit a federal convict directly to a CCC for service of her term of imprisonment. Therefore, on the basis of the above, the court will grant Ms. Howard's petition for a preliminary injunction as she has shown a substantial likelihood of success on the merits of her APA claims.

## C. Section 2255 Claims

With regard to Ms. Howard's claims under 28 U.S.C. § 2255, the court is not confident that it could find that she would be substantially likely to prevail on the merits at this juncture. This case is not significantly distinguishable from other recent cases addressing this very same issue on a key ground. While this court surely *would* have imposed a different sentence if it knew that the Bureau would change its interpretation of the word "imprisonment" as it relates to CCCs during her term of incarceration and enact its new "policy," it couldn't have ordered Ms. Howard to

---

107. *See Bowen v. Hood,* 202 F.3d 1211, 1220–21 (9th Cir.2000); *Cort v. Crabtree,* 113 F.3d 1081, 1084 (9th Cir.1997).

serve her entire term of imprisonment in a CCC.[108]

It is true that she might have avoided the application of the new "policy" retroactively due to the 150–day limit had the court given her a lesser sentence by lowering her offense level further according to its discretion.[109] But, the court still could not have given her probation, as her offense was non-probatable.[110] Only probation would have allowed her to be directly committed to a CCC because, as previously discussed, it is the courts who dictate the manner in which sentences of probation are carried out. However, despite the lack of the court's confidence on the merits of Ms. Howard's section 2255 claims, a definitive ruling is unnecessary here because the court has already found that a preliminary injunction is warranted on her APA claims.

Accordingly, Ms. Howard's motion for a preliminary injunction (doc. 2–civil case) is GRANTED. The Bureau of Prisons, and its leadership in the persons of United States Attorney General John Ashcroft, Bureau Director Kathleen Hawk Sawyer, the Bureau's Regional Director for the South East Region, Ray E. Holt, and Callie P. Farr, their officers, agents, servants, employees, attorneys, and those persons in active concert or participation with them are hereby enjoined from transferring Ms. Howard from Bannum Place of Orlando pending a final ruling on the merits of this case.

---

**108.** *See, e.g., Culter,* 241 F.Supp.2d at 22(altering sentence because such alteration was permissible under case facts); *U.S. v. James,* 2003 WL 328842 at *2, 244 F.Supp.2d 817, ——, (E.D.Mich.2003)(refusing to alter sentence because imprisonment was required under case facts); *Herron,* 2003 WL 272170 (E.D.Mich.2003), 2003 U.S. Dist. LEXIS 1932 (same).

**109.** This is because once the Government submitted its § 5K1.1. motion, the court was free to reduce Ms. Howard's offense level as it saw fit based on the particular circumstances of her case. *See United States v. Hashimoto,* 193 F.3d 840, 843 (5th Cir.1999)(stating that "[d]istrict courts have almost complete discretion to determine the extent of a departure under § 5K1.1" and that the only ground that the extent of a departure is appealable is if the departure was in violation of the law.)(internal citations omitted).

